UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | |
| JARED FOGG, | ) | 1:18-CR-00156-LEW |
| | ) | |
| Defendant | ) | |

# DECISION AND ORDER ON
# DEFENDANT'S MOTION TO SUPPRESS

On October 12, 2018, Jared Fogg was indicted on one count of "knowingly and intentionally possess[ing] with the intent to distribute 50 grams or more of methamphetamine, a Schedule II controlled substance," in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii). Indictment (ECF No. 16). Fogg now moves to suppress evidence gathered from the July 12, 2018 stop and search of a pickup truck in which he was a passenger as well as all information obtained as a result of the warrant to search three cellphones recovered in the search of the truck. Mot. to Suppress ("Motion") (ECF No. 45). The motion is **DENIED**.

## BACKGROUND

The parties do not contest the key facts. On July 11, 2018, the Maine Drug Enforcement Agency ("MDEA") received a call from a confidential source indicating that Jared Fogg had rented Room 34 at the Briarwood Motor Inn in Lincoln, Maine, and was

there to sell illegal drugs.[1] Response, Ex. 1 ¶ 1 (ECF No. 51-1, #110). This source did not indicate which type of drugs Fogg was allegedly selling, but the source did notify MDEA that Fogg was joined by an "Indian" male and was using a white Ford F250 pickup with Florida plates 578PMW. *Id.* The source also told the MDEA agent that Fogg was carrying a firearm. *Id.*

On the same day, the Lincoln Police Department received a complaint from a co-conspirator who admitted to selling "ice" or "crystal" methamphetamine and heroin in the Lincoln area. *Id.* ¶ 9. This co-conspirator informed police that he received his supply from Fogg and provided details regarding when and where he purchased drugs from Fogg . *Id.* That day, Lincoln Police officers observed the co-conspirator and Fogg together in the parking lot of the Briarwood Motor Inn. *Id*

On the morning of July 12, 2018, an MDEA agent observed a white Ford F250 pickup with Florida registration matching the confidential source's description at the Briarwood Motor Inn. *Id.* Upon conducting a registration check on the pickup, MDEA agents learned the truck was registered to two men from Florida – one of whom was named Rogelio Rios. *Id.* ¶ 2. MDEA officers showed a picture of Rios to the confidential source and the source confirmed Rios looked like the man accompanying Fogg. *Id.*

Fogg had been linked to drug activity in northern Maine on multiple occasions prior to the July 12, 2018 traffic stop. On July 13, 2017, a cooperating defendant supplied MDEA with information that Fogg commonly travelled from Florida to Maine and would

---

[1] The Agent who received this call indicated the source had "provided credible information in the past." Response, Ex. 1 ¶ 1 (ECF No. 51-1, #110).

remain in Maine for 2-3 weeks at a time in order to sell crystal meth. *Id.* ¶ 6. This informant indicated they had seen "Fogg with a gallon sized Ziploc bag full of crystal meth and a large amount of money spread out on the bed." *Id.* On March 16, 2018, another cooperating defendant stated Fogg was the methamphetamine source for the Houlton area. *Id.* ¶ 7. On July 3, 2018, a third cooperating defendant stated Fogg was one of the "big fish" in the Houlton crystal methamphetamine trafficking market and indicated that Fogg drove a "new Florida plated white Ford pickup." *Id.* ¶ 8. Two of the cooperating defendants indicated that Fogg commonly rented a hotel room for the purposes of selling drugs. *Id.* ¶¶ 6, 8.

Based on the reports from the three cooperating defendants as well as the information provided by the confidential source, MDEA obtained a state search warrant on July 12, 2018, for Room 34 and set up surveillance at the Briarwood Motor Inn. *Id.* ¶ 10; Response, Ex. 2 (ECF No. 51-2). Throughout the course of the day, officers observed Rios driving the truck as he made various stops at Walmart, Circle K, and the Daigle Oil Company. Response, Ex. 1 ¶¶ 12-13 (ECF No. 51-1). Officers then observed Rios pick up Fogg from a residence in Houlton, after which Rios and Fogg travelled to several residences and made multiple stops at a local gas station. *Id.* ¶ 13. Rios and Fogg then travelled to Mattawamkeag and stopped at a residence for nearly an hour, during which time officers observed three individuals outside the truck with the doors open, "removing something from the vehicle." *Id.* ¶ 14. Fogg and Rios then returned to Lincoln, stopped at the Lincoln Circle K, and ultimately returned to the Briarwood Motor Inn. *Id.* ¶¶ 14-15.

Upon their arrival at the Briarwood Motor Inn, Lincoln Police Officers conducted a traffic stop on the vehicle. *Id.* ¶ 15. Officers searched the white Ford pickup and recovered various items including firearms and illicit drugs.[2] Response, 4 (ECF No. 51, #100). Additionally, officers seized three cellphones. *Id.*

On September 19, 2018, law enforcement officers received a federal search warrant for the three cellular telephones recovered during the July 12, 2018 stop and search. Response, Ex. 3 (ECF No. 51-3). In support of the search warrant, the MDEA submitted an affidavit detailing the July, 2018 events and substantiating the Task Force Officer's belief, based on his training and experience, that a search of the three telephones would "yield[] evidence of contact and association between and among narcotics traffickers, customers and associates."[3] *Id.* ¶ 17.

---

[2] The items collected included:
- A 9 mm loaded handgun with a teal colored grip. The handgun was found in Fogg's bag. An NCIC check through dispatch resulted in the firearm having been reported stolen;
- A Keltic PF9 9 mm loaded handgun with a round in the chamber was found in the driver's side center console;
- Suspected black tar heroin weighing 10 grams found on Fogg's person;
- Suspected heroin weighing 32.4 grams found on Fogg's person;
- Crack cocaine weighing 2.2 grams found on Fogg's person;
- Methamphetamine weighing 125.1 grams found in a hide located in the headliner of vehicle;
- U.S. Currency totaling Nineteen Thousand Eight Hundred Eighty-Eight Dollars ($19,888.00) found in Fogg's bag; and
- Three cellular telephones.

Response 4 (ECF No. 51, #100).

[3] Specifically, the affidavit stated:

I know that narcotics traffickers regularly use cellular telephones to maintain contact with their sources of supply, their customers, and their couriers. The devices are used to send and receive drug related text and e-mail messages that sometimes remain on the phones. The devices are also used to save contact names and numbers for sources of supply, customers, and couriers. In this case, it is probable that the telephone contains names and numbers of such people and text exchanges.

4

**DISCUSSION**

Fogg makes three arguments in favor of his motion to suppress. First, he contends that Maine Drug Enforcement Agency ("MDEA") agents "lacked reasonable and articulable suspicion to stop the truck." Motion 1 (ECF No. 45, #81). Second, he argues that "law enforcement lacked probable cause to arrest Mr. Fogg and the driver immediately following the stop, and searched the vehicle absent probable cause to arrest and without a warrant." *Id.* Third, he asserts that the cell phone "search warrant affidavit lacked probable cause the cellphones would contain evidence of a crime." *Id.*

**I.    TRAFFIC STOP SUPPORTED BY REASONABLE AND ARTICULABLE SUSPICION**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. When law enforcement officers stop an automobile and detain its occupants, they have effectuated a "seizure" that necessarily implicates the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also United States v. Chhien*, 266 F.3d 1, 5 (1st Cir. 2001). However, a "traffic stop" is not violative of a

---

Cellular devices similar to the one described [in the affidavit] have the ability to take and save photographs and videos, store information, and access the internet. Based on my training and experience and conversations with other law enforcement agents who conduct narcotics trafficking investigations, I know that drug traffickers use these devices to store photographs of associates, search the internet for various drug related purposes, and access their social media accounts and those of their associates. I have known drug traffickers to take photographs of themselves with their criminal associates, drugs, firearms, and drug proceeds.

Based on my training and experience, my involvement in this investigation, and conversations with other law enforcement agents who conduct narcotics trafficking investigations, I know searches of cellular telephones have yielded evidence of contact and association between and among narcotics traffickers, customers and associates, including the items described in . . . above.

Response, Ex. 3 ¶¶ 15-17 (ECF No. 51-3, #149-50).

defendant's constitutional rights if the stop is supported by "a reasonable and articulable suspicion of criminal activity" and the detention is reasonable under the circumstances.[4] *Chhien*, 266 F.3d at 6 (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).

Reasonable suspicion requires "more than a naked hunch that a particular person may be engaged in some illicit activity," but yet "does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime." *Id.*; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'") (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The degree of reasonable suspicion necessary to justify a traffic stop is "dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). This standard looks to the particular facts of the case and requires "broad-based consideration of all the attendant circumstances." *Chhien*, 266 F.3d at 6 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Courts also routinely apply the "collective knowledge" or "pooled knowledge" principle, which allows for reasonable suspicion to be "imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion." *United States v. Barnes*, 506 F.3d 58, 63 (1st Cir. 2007).

When reasonable suspicion is based on information from an informant, courts consider whether the information "bears sufficient 'indicia of reliability.'" *United States v. Barnes*, 506 F.3d 58, 64 (1st Cir. 2007) (quoting *Adams v. Williams*, 407 U.S. 143, 147

---

[4] In the context of a traffic stop, "an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).

(1972)). This determination looks to "all the circumstances bearing upon the tip itself and the tipster's veracity, reliability, and basis of knowledge." *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004). The First Circuit has adopted a variable approach to the quantum of support for an informant's testimony, stating: "[W]here informants are known, a lesser degree of corroboration can be required." *Barnes*, 506 F.3d at 64. In adopting this approach, the First Circuit cited the Supreme Court's decision in *Adams v. Williams* upholding a Terry stop based on an uncorroborated tip primarily because the informant was "known to [the officer] personally and had provided him with information in the past." 407 U.S. at 146-47.

Fogg's contention that MDEA agents "lacked reasonable and articulable suspicion" of criminal activity is contradicted by the record. Motion 1 (ECF No. 45, #81). Fogg's drug dealing activities in Northern Maine had been catalogued by local police and MDEA agents since July 2017. *See* Response, Ex. 1 ¶ 6 (ECF No. 51-1, #110). Over several months, law enforcement officers had received a number of reports from several cooperating defendants detailing Fogg's pattern of dealing as well as his notoriety in the Houlton drug market. *Id.* ¶¶ 6-8.

Most significant to my determination is consideration of the events immediately preceding the traffic stop at issue. On the day prior to the stop, law enforcement officers received information from a known confidential source who indicated that Fogg was present in Maine to sell illegal drugs and provided additional information regarding Fogg's companion, his transportation, and his accommodations while in Maine. *Id.* ¶ 1. This source had provided reliable information in the past and officers were able to verify key

7

aspects of this report prior to their traffic stop. *Id.* ¶ 1. Furthermore, it was only after observing Fogg and his companion, Rios, throughout the day engaging in what the officers testified they believed was drug-related activity,[5] that the officers conducted the traffic stop at issue. *Id.* ¶¶ 12-15. Based on a consideration of these facts and "all the attendant circumstances," *Chhien*, 266 F.3d at 6, it is clear law enforcement possessed a reasonable and articulable suspicion justifying their stop of the truck in which Fogg was a passenger.

## II. PROBABLE CAUSE TO SEARCH VEHICLE

Fogg asserts next that law enforcement lacked probable cause to search the vehicle.[6] Motion 1 (ECF No. 45, #81).

As a general rule, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is the "automobile exception" which provides that "police officers may seize and search an automobile prior to obtaining

---

[5] One of the MDEA officers who observed Fogg and Rios throughout the day testified that "[b]ased on [her] training, education, experience and the intelligence information [she] had received, it was [her] belief that Rios and Fogg were collecting money and/or delivering drugs to their clientele in Houlton." Response, Ex. 1 ¶ 13 (ECF No. 51-1, #113).

[6] Citing *Arizona v. Gant*, 556 U.S. 332 (2009), Defendant argues that "[a]bsent probable cause to arrest, the agents lacked authority to conduct a warrantless search of the truck," asserting that "*Gant* only authorizes a warrantless search incident to arrest." Def.'s Reply, 6 (ECF No. 69, #187). However, this argument miscasts the fundamental authority under which police searched the truck. Furthermore, Defendant's assertion is directly contrary to First Circuit precedent. As stated in *United States v. Polanco*:
> *Gant* dealt with the search-incident-to-arrest doctrine in the vehicle context. . . . Gant also noted that officers may conduct vehicle searches under other doctrines. . . . Only the auto exception matters here—an exception that provides that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," agents can search without a warrant "any area of the vehicle in which the evidence may be found." And, critically, Gant did not scrap that exception. That is not just our opinion: every circuit that has considered the issue to date has either concluded or assumed that the auto exception survived under Gant.

634 F.3d 39, 42 (1st Cir. 2011) (internal citations omitted).

a warrant where they have probable cause to believe that the automobile contains contraband." *United States v. Silva*, 742 F.3d 1, 7 (1st Cir. 2014); *see also Ornelas v. United States*, 517 U.S. 690, 693 (1996) ("[A] warrantless search of a car is valid if based on probable cause."); *United States v. Polanco*, 634 F.3d 39, 42 (1st Cir. 2011) ("[T]he auto exception . . . provides that '[i]f there is probable cause to believe a vehicle contains evidence of criminal activity,' agents can search without a warrant 'any area of the vehicle in which the evidence may be found.'") (quoting *Arizona v. Gant*, 556 U.S. 332, 347 (2009)).

Probable cause to search a vehicle is present "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas*, 517 U.S. at 696 (citing *Brinegar v. United States*, 338 U.S. 160, 175–176 (1949)). As stated by the First Circuit, "[t]he standard is satisfied when the totality of the circumstances create 'a fair probability that . . . evidence of a crime will be found in a particular place.'" *Silva*, 742 F.3d at 7 (quoting *United States v. Hicks*, 575 F.3d 130, 136 (1st Cir. 2009)).

The record indicates that at the time law enforcement officers searched the vehicle in which Fogg was a passenger, they had a reasonable and articulable suspicion of criminal activity that justified the traffic stop and the same facts underlying their suspicion provided "ample evidence supporting a finding of probable cause for a search" of the vehicle. *Silva*, 742 F.3d at 7. As discussed above, law enforcement had received numerous reports concerning Fogg's drug dealing activities in northern Maine. Response, Ex. 1 ¶ 6 (ECF No. 51-1, #110). These reports indicated Fogg routinely travelled North from Florida with

the express purpose of selling illicit drugs in the Houlton area. *Id.* ¶¶ 6, 8. At least two of these reports referenced Fogg's use of a "white Ford pickup" matching the description of the vehicle searched. *Id.* ¶¶ 1, 8. Finally, on the day of the search, law enforcement officers had observed Fogg making various stops throughout Houlton and Mattawamkeag in the white pickup truck and believed these stops were for the purpose of "collecting money and/or delivering drugs to their clientele in Houlton." *Id.* ¶¶ 12-15. This evidence establishes that officers had sufficient probable cause to believe the truck Fogg and Rios had driven throughout the day contained "evidence of criminal activity"; therefore, under the 'auto exception,' officers were free to search "any area of the vehicle in which the evidence may be found" without a warrant. *Polanco*, 634 F.3d at 42.

### III. PROBABLE CAUSE & CELL PHONE WARRANTS

Finally, Fogg asserts that the cell phone "search warrant affidavit lacked probable cause the cellphones would contain evidence of a crime." Motion 1 (ECF No. 45, #81). Specifically, Fogg argues that "there is no nexus between the alleged crime and the cellphones searched" because the affidavit supporting the warrant "provide[d] no facts from the investigation alleging Mr. Fogg or Mr. Rios ever communicated with or used a cellphone for drug related purposes." Def.'s Response, 6-7 (ECF No. 69, #187).

An application for a warrant must "demonstrate probable cause to believe" first, "that a particular person has committed a crime" and second, "that enumerated evidence relevant to the probable criminality likely is located at the place to be searched." *United States v. Zayas-Diaz*, 95 F.3d 105, 110–11 (1st Cir. 1996). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not

readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Thus, in making a determination of whether probable cause exists, the judicial officer reviewing the application must "make a practical, common-sense decision whether, given all circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see also United States v. Woodward*, 173 F. Supp. 2d 64, 68 (D. Me. 2001), *aff'd sub nom. United States v. Jackson*, 43 F. App'x 397 (1st Cir. 2002). When challenged, a reviewing court must "assess [] whether a substantial basis existed for finding probable cause to issue the warrant" and give "great deference" to the "issuing judge's determination of probable cause." *United States v. Feliz*, 20 F. Supp. 2d 97, 101 (D. Me. 1998), *aff'd*, 182 F.3d 82 (1st Cir. 1999) (citing *Gates*, 462 U.S. at 236).

On September 19, 2018, law enforcement officers received a federal search warrant for three cellular telephones seized on July 12, 2018 from Fogg and Rios. Response, Ex. 3, 1 (ECF No. 51-3, #131). In support of the warrant application, an officer of the Drug Enforcement Administration ("DEA") submitted an affidavit detailing the events and reports that ultimately led officers to search the vehicle and arrest Fogg as well as a recitation of the items recovered from the truck on the day of the search. *Id.* 3-6. In addition to these factual assertions, the affidavit also detailed the officer's training and experience that, when coupled with the underlying facts of the case, formed the basis of his belief that Fogg and Rios were "involved in the distribution of narcotics" and that "a search of the cellular telephone[s] . . . would likely produce evidence of associations, drug

11

customers, and drug suppliers." *Id.* 7; *see also United States v. Rivera*, 825 F.3d 59, 66 (1st Cir. 2016) ("[T]he Federal Reporter is teeming with First Circuit opinions . . . saying that a 'law enforcement officer's training and experience may yield insights that support a probable cause determination."). The officer espoused a view that has been echoed by the Supreme Court: "Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *See Riley v. California*, 573 U.S. 373, 401 (2014). The granting judge accepted this affidavit as providing a "substantial basis . . . for finding probable cause to issue the warrant" and I defer to his reasonable determination that was clearly supported by the evidence provided to him. *Feliz*, 20 F. Supp. 2d at 101 (citing *Gates*, 462 U.S. at 236).

## CONCLUSION

For the reasons discussed above, Defendant Fogg's Motion to Suppress (ECF No. 45) is **DENIED**.

**SO ORDERED.**

Dated this 11th day of March, 2019

/s/ Lance E. Walker
**UNITED STATES DISTRICT JUDGE**